Filed 8/22/23  P. v. High CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GREGORY DEAN HIGH,<br><br>Defendant and Appellant. | F082478<br><br>(Super. Ct. Nos. CRF60095, CRF49073)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Carey, and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Gregory Dean High was charged with three counts of corporal injury to a spouse (Pen. Code,[1] § 273.5, subd. (a), counts 1, 3 & 4), each containing an allegation that High had suffered previous domestic violence convictions within the past seven years (§ 273.5, subd. (f)(2)) and two counts of false imprisonment by violence (§ 236, counts 2 & 5). In counts 1, 2 and 3, it was further alleged that High personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). The charges stem from three incidents occurring on the same day involving High's estranged wife.

A jury found High guilty of two counts of corporal injury to a spouse (§ 273.5, subd. (a), counts 1 & 3) and two counts of felony false imprisonment (§ 236, counts 2 & 5). The jury found the great bodily injury enhancements for counts 1 and 3 true. The trial court dismissed the great bodily injury enhancement as to count 2 pursuant to the People's motion. The trial court imposed an aggregate state prison term of 13 years four months.

On appeal, High raises the following claims: (1) the false imprisonment conviction related to the third incident at the Intake Grill (count 5) is not supported by sufficient evidence, (2) the court erred by failing to instruct the jury sua sponte on the lesser included offense of attempted false imprisonment, (3) the trial court abused its discretion in admitting testimony regarding prior incidents of domestic violence, (4) the court committed *Yurko*[2] error by failing to notify High of his rights and obtain a waiver before accepting High's admissions to prior convictions, (5) the matter should be remanded for resentencing under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567), (6) his sentence violates section 654, and (7) he was entitled to an ability to pay

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

[2] *In re Yurko* (1974) 10 Cal.3d 857 (*Yurko*).

2.

hearing under *Dueñas.*[3] The People disagree with High's claims but concede that High's sentence violates section 654 and resentencing is required. As such, the People contend we need not consider whether or not the sentence violates newly amended section 1170, subdivision (b), since the trial court will have the opportunity to apply the new terms at the resentencing hearing.

We conclude the trial court committed *Yurko* error and set aside the true findings as to the alleged prior domestic violence and prior strike convictions, vacate High's sentence, and remand for the trial court to hold further proceedings not inconsistent with this opinion. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

T.H. was previously married to High and had a child with him. T.H. met High when she was eight years old, and they became a couple when she was 21 or 22 years old. In 2010, within six months of becoming a couple, High became controlling and his behavior escalated into cussing at T.H. and calling her names. In 2011, T.H. described their relationship as "rough," meaning there were a lot of fights and arguments. T.H. became pregnant at that time but suffered a miscarriage due to stress. T.H. became pregnant a second time and gave birth to her daughter, G. High and T.H. attempted to work things out in their relationship but continued to fight "extremely bad." They were together for approximately five years before getting married on October 11, 2015.

### A. Evidence Code Section 1109 - Previous Incidents of Domestic Violence

*September 3, 2010 Incident Against R.D.*

R.D. testified she was in a relationship with High back in 2006 that ended after having a child in October of 2011. R.D. recalled an incident on Chucker Circle in

---

3      *People v. Dueñas* (2019) 30 Cal.App.5th 1157.

September of 2010 where the police arrived.  At trial, R.D. denied the incident involved her and High.

Deputy David Vasquez testified that he responded to a disturbance on Chucker Circle on September 3, 2010, around 10:56 p.m.  Vasquez noticed two to four individuals involved in a physical fight and saw High holding another individual in a headlock with his arm around his neck.  The individual sounded like he was gasping for air.  Vasquez told High to let go, but High did not initially comply.  After High was detained, Vasquez spoke with R.D. who indicated the fight started because High, her current boyfriend, was jealous over her ex-boyfriend.  Vasquez said R.D. told him High got upset because R.D. was texting her ex-boyfriend and talking about going to a party with him.  High grabbed R.D. by the arms and threw her to the ground.[4]  Vasquez further testified that after reading High his *Miranda* rights, High admitted he grabbed R.D. by the arms and pushed her away from him, but denied throwing her to the ground.

### March of 2015 Incident Against T.H.

T.H. testified she was with High at his mother's house for a party. T.H. did not hear High calling her name which made him extremely mad.  High hit T.H., grabbed her by the neck, and threw her to the ground by kicking her feet out from under her.  T.H. said she received scratches on her head, and her hair became so matted with blood she could not brush through it.  High's cousin, who attempted to break up the fight, received an ankle fracture from the altercation with High.  High's mother asked T.H. to lie and say she was injured in a wreck on a dirt bike.  T.H. took photographs of the injuries to her face.  She did not report the incident to the police because she was scared and because High's mother asked her to lie.

---

**4**      At trial, R.D. denied telling Vasquez that High had gotten physical with her after getting jealous over an ex-boyfriend.  She also denied telling the officer that High started the fight with another male.

*June 25, 2015 Incident Against T.H.*

On June 25, 2015, High came to T.H.'s home around 5:00 a.m. and broke in through the garage door and the front door. T.H. explained that High took her phone because he was convinced she was sleeping with his cousin. High placed his hands on T.H.'s face, squeezed her cheeks, pushed her head down, and grabbed her. T.H. said she was scared and ran to the bathroom while High scrolled through her phone. T.H. locked her daughter G. and herself in the bathroom. High was trying to get into the bathroom, so T.H. put her back against the door and feet against the cupboard to keep him from entering. High cracked the bathroom door. T.H. called the police.

Sergeant Ken Grognet responded to the scene. Grognet noted damage to the doorframe of the entry door leading from the garage into the apartment and damage to an interior door leading into a bathroom. He found T.H. upset and crying. T.H. gave the police a statement and pictures of the damage to her doors. Later that day, Grognet spoke with High who confirmed he entered the house through the garage door and admitted he punched a hole in the bathroom door during the argument. Grognet noted there were several holes in the door. T.H. also told the police about the earlier incident that occurred in March of 2015 at High's mother's house. T.H. gave them photographs depicting her face and neck.

After these two incidents, T.H. said she moved to Arizona and then later returned to Mi-Wuk, California. She maintained a rocky relationship with High even though they lived separately. In October they married.

*January 13, 2016 Incident Against T.H.*

In the evening of January 13, 2016, while T.H. was sleeping, High appeared in her house. According to T.H., she and High had broken up, were no longer living together and he did not have permission to be inside. High did not have a key and entered through a sliding glass door in one of the rooms. The sliding glass door was locked but he could "just jimmy it." T.H. said she woke up to see High in her bedroom. High was visibly

drunk and smelled of alcohol. They got into a verbal fight and T.H. was able to get High to leave, but he came back multiple times during the night through the same sliding glass door. Each time he came back, T.H. would try to get him to leave and they would argue. At some point, High became physically violent and pushed T.H. and choked her. T.H. pushed him away, ran to the kitchen, and called 911. The dispatcher stayed on the line with T.H. until High left. Law enforcement arrived and took T.H.'s statement and photographed the marks around her neck and knot to her forehead. Detective Skylar Waid observed bruising around T.H.'s neck and throat. There were lines on her neck like fingers and she had bruising above her left elbow. Her right wrist was also red. Her right hand was swollen and, two days later, she developed swelling in her wrist and elbow.

***August of 2018 Incident Against T.H.***

In August of 2018, T.H. and High were living together in a house on Crystal Falls. They had a party at the house and High's cousin was there. They were all drinking and, at some point, T.H. began to feel unwell. She went downstairs to take a bath. When High could not find T.H. or his cousin, he accused T.H. of sleeping with his cousin. While T.H. was still in the bathtub, High confronted her, started yelling at her, and hit her in the face. T.H.'s nose started bleeding and they continued fighting as they moved out of the bathroom. High ended up on top of T.H., choking her. T.H. went in and out of consciousness finally telling High to "just kill me and get it over with." High stopped choking her, started crying and told T.H. how sorry he was. T.H. did not report this incident to police because High was crying and saying this would never happen again and she believed him. The next day, T.H. took pictures, including one of her bed showing blood all over it from her nose and mouth, in case something bad happened to her and sent them to a friend.

***October 2, 2018 Incident Against T.H.***

While T.H. was still living at Crystal Falls, High and T.H. got into an argument with a lot of pushing and shoving. High grabbed T.H. by her neck, swept her feet out

6.

from underneath her, and slammed her to the ground. T.H. used her feet to push High backwards causing him to fall down the stairs and into the fireplace. T.H.'s mother arrived and High threatened T.H.'s mother and then left.

### B.   Charged Incident on February 13, 2019

*Counts 1 and 2*

In February of 2019, T.H. and High were no longer together. T.H. was living with K.C. and M.M. T.H. had been friends with K.C. for about five or six years. High was one of M.M.'s best friends from childhood.

On February 13, 2019, T.H. went to K.C. and M.M.'s home around 2:00 p.m. to hang out with them. After dinner, they started drinking and had about three or four shots of Crown Royal; M.M. also had a case of beer. During that time, High showed up at the house and drank with them. K.C. did not recall how many shots they took but recalled being intoxicated.

Initially, everyone was getting along but soon an argument ensued between T.H. and High. T.H. said she went upstairs to text a friend[5] when High went up the stairs and asked who she was talking to. T.H. lied and they began to argue. T.H. tried to walk away but High pushed her into the bathroom and closed the door behind him. T.H. did not want to be in the bathroom with High but could not get close enough to the door to leave. High pushed T.H., causing her to fall backwards, trip over the toilet, and land in the bathtub, hitting the back of her head on the faucet. T.H. got out of the bathtub and the argument continued. High was yelling in her face, and she was in a corner telling him to get away. T.H. tried to leave the bathroom but High kept pushing her, standing in front of her, and blocking her exit.

K.C. testified that she went upstairs to check on them and heard High and T.H. talking in the bathroom with the door closed. K.C. was concerned and wanted to make

---

[5]     At the trial, T.H. said this friend was now her fiancé.

sure everything was okay so she banged on the door and opened it. According to T.H.,
K.C. opened the bathroom door and started arguing with High, which distracted High and
allowed T.H. to get out of the bathroom and run downstairs. T.H. did not know if High
locked the bathroom door but recalled K.C. was able to open the door without a key. At
trial, K.C. said that when she opened the upstairs bathroom door, T.H. was crying and
High left the bathroom while she spoke with T.H. T.H. told K.C. that High pushed her
down and hurt her by the bathtub and shower. Officer Erik Webber relayed that K.C.
reported to him she heard T.H. and High fighting and arguing in the bathroom. K.C. told
Webber she forced open the bathroom door and told them to stop fighting. T.H. left the
bathroom, followed by High.

*Count 3*

T.H. explained that after hitting her head on the faucet, her recollection of what
happened next was fuzzy. She described it as "walking through a really thick fog." After
leaving the bathroom, T.H. went outside in the street, followed by High who would not
allow her to leave. T.H. remembered telling K.C. to call someone to get her out of there.
When neighbors came outside and intervened, T.H. said she ran away. High followed
her, calling her name a few times. T.H. said she was scared. Officer Webber, who took
T.H.'s statement later that night, said T.H. told him she and High were arguing and High
grabbed her throat with his right hand and squeezed, preventing her from breathing in a
normal manner. High put his leg behind her and forced her violently to the ground,
slamming the backside of her head on the pavement.

K.C. testified she went outside and saw T.H. leaving, so K.C. and High went after
her. K.C. saw High and T.H. in front of one of the neighbor's houses; the neighbors were
outside. K.C. said one neighbor was arguing with High. K.C. joined T.H. as T.H. was
talking with another neighbor and then T.H. took off. K.C. did not see High hold T.H.
there against her will. Officer Webber stated that K.C. told him she saw T.H. and High

outside in front of her house running around, arguing, and yelling at each other.[6]  K.C. told Webber she saw High push T.H. a couple of times.

Neighbors T.R., K.T. and C.T. testified they went outside when they heard a man and woman fighting.  They saw a man holding onto a woman's arm as she was struggling and trying to get away, saying let go of me and "don't touch me."  K.T. and C.T. both said they were worried for the woman and told the man to take his hands off of her and to get out of there.  They saw the man get angry and aggressive.  K.T. said the man wanted to fight him  and said something like " '[m]ind your business' " or " 'I'll beat your ass.' "

T.R. called law enforcement because she was a mandated reporter.[7]  She, K.T., and K.C. said they followed the man and the woman down the street towards K.C.'s house.  C.T. noticed the woman looked scared and was visibly trying to get away from the man.  She said the man kept grabbing the woman, and the woman kept trying to pull away.  K.T. saw the woman reverse direction and start walking back towards downtown. The man also turned around to follow the woman.

T.R. had surveillance cameras that captured part of this incident.  She made a link of the video and shared the link with the victim.  The video was played for the jury.

---

[6]  At trial, K.C. denied telling the officer that after the restroom she saw T.H. and High running around outside in the middle of the street and yelling at each other.  She also denied telling the officer she saw High push T.H. several times and stated she did not see High put his hands on T.H.  K.C. did not remember telling the officer that T.H. ran down the road and High left in his vehicle.  K.C. did not recall if High threatened to beat up the neighbor.  She admitted she did not come to court voluntarily but was subpoenaed to testify as a witness.  Her son's father's close relationship with High was part of the reason why K.C. did not want to testify.

[7]  T.R. explained because she works for a hospital, she is a mandated reporter and must report unlawful activity.

9.

*Counts 4 and 5*

T.H. testified she ran downtown and hid inside the Intake Grill because she knew the bartender and cook that worked there. T.H. told the employees that High followed her and she needed to hide. They confirmed High was outside looking or waiting for her.[8] T.H. waited inside for her friend to pick her up. Officer Webber testified T.H. reported that High followed her to the Intake Grill and caught up to her at the back of the building. High grabbed T.H. by the throat and forced her up against the back of the wall. T.H. told Webber she was able to get away from High and went inside the Intake Grill to hide from him.

T.H. reported the incident to law enforcement the next day. Officer Webber photographed T.H.'s injuries. The pictures depicted the injury to the back of T.H.'s head, as well as marks on her neck and under her chin. T.H. also had a bruise on her arm and on the back of her shoulder and her back. Officer Webber noticed redness and bruising on T.H.'s throat area and redness and bruising on her left shoulder and elbow. T.H. stated she also had bruising on her right buttocks as well. Webber felt the back of T.H.'s head and noticed a swollen mass on the back of her head. T.H. later informed Webber that one of her neighbors had surveillance video of the incident. Webber received a YouTube link to the video.

T.H. explained she went to the hospital because she was seeing stars, had really bad slurred speech, and stated, "one of my pupils [was] blown." Dr. Kimberly Freeman testified she was working in the emergency room on February 14, 2019, and treated T.H. T.H. described two head trauma incidents to the doctor. T.H. told the doctor she had been assaulted that night and she had a headache and her legs felt heavy. T.H. complained of increased nausea and vomiting and stated that light bothered her eyes and

---

[8] According to K.C., High followed T.H. on foot to the Intake Grill and K.C. followed them both. When K.C. arrived, High was there but T.H. was not. K.C. said High went back to her house with her.

that her vision was " 'jumpy.' " Dr. Freeman noted a hematoma on T.H.'s head. Dr. Freeman diagnosed T.H. with head trauma, concussion, migraine, and domestic violence. Dr. Freeman's diagnosis was based on reported symptoms and a physical exam.

Upon request of the prosecution, the court took judicial notice of certified copies of High's two prior convictions. One of the prior convictions was for spousal battery for the incident that occurred in 2015.

## II. Defense Evidence

C.H. is High's father. T.H. called C.H. to tell him about the February 13th incident a few weeks after it occurred. High accused T.H. of being on her cell phone with someone else while she was in the bathroom. High went into the bathroom and took T.H.'s phone. She told C.H. that she got mad at High for always taking her cell phone and started hitting him. She said she did not really remember anything else because they were all drunk. T.H. also told C.H. about going outside and being so drunk she fell in a ditch.

C.H. admitted that he had two misdemeanor convictions for domestic violence. When T.H. told him she was drunk and fell in a ditch, C.H. knew High was already charged with domestic violence relating to the incident, but C.H. admitted he did not forward that information to the police. C.H. explained he did not report it to police because he thought T.H. would not follow through with the allegations.

## III. Rebuttal Evidence

T.H. was recalled as a rebuttal witness. She testified she was close to C.H. and that he knew about High's incidents of domestic violence and was even present for a few of them. C.H. called T.H. when she was in the hospital on February 14, 2019, and asked her to lie about what happened to the police officers and the hospital staff. T.H. said she

11.

never told C.H. she fell into a ditch on February 13, because that never happened.  She did not tell C.H. she was drunk either.  T.H. said C.H. has lied a few times.

## IV.    Verdict and Sentencing

The jury found High guilty of corporal injury to a spouse causing great bodily injury regarding the incident in the bathroom (§§ 273.5, subd. (a) & 12022.7, subd. (e), count 1), false imprisonment by force or violence in the bathroom (§ 236, count 2), corporal injury to a spouse causing great bodily injury regarding the incident in the street in front of the house (§§ 273.5, subd. (a) & 12022.7, subd. (e), count 3), and false imprisonment by force or violence at the Intake Grill (§ 236, count 5).  The jury found High not guilty of corporal injury to a spouse regarding the incident at the Intake Grill alleged in count 4.

Prior to trial, High admitted the prior strike allegation and the prior domestic violence conviction allegation.  Additionally, pursuant to the People's motion, the court dismissed the great bodily injury enhancement as to count 2.

The trial court held a combined sentencing hearing for this case (CRF60095) and a violation of probation from a 2016 conviction (CRF49073) for first degree burglary (§ 459) and corporal injury to a child with a prior (§ 273.5, subd. (f)(1)) for which High was placed on five years felony probation.  The court sentenced High to an aggregate term of 12 years in prison for his convictions in this case.  On count 1, the court imposed the middle term of four years, doubled pursuant to the strike prior to eight years.  On count 2, the court imposed a concurrent sentence of the upper term of two years, doubled pursuant to the strike prior to four years, to be served concurrently.  On count 3, the court imposed one third the middle term, doubled to two years eight months, to be served consecutively to count 2.  Five years for the enhancement pursuant to section 12022.7, subdivision (e) was imposed but stayed. On count 5, the court imposed one-third the middle term, doubled to one year four months, to be served consecutively to count 3.

12.

The court stayed punishment for the great bodily injury enhancements. The trial court imposed a restitution fine of $7,500 pursuant to section 1202.4, subdivision (b).

In case No. CRF49073, the court imposed a term of 16 months for first degree burglary, which was one third the midterm to be served consecutively to the term in this case (case No. CRF60095), and the upper term of five years for injury to a child with a prior conviction to be served concurrent to the term in case No. CRF60095. Additionally, the trial court imposed a restitution fine of $1,500 pursuant to section 1202.4.

## DISCUSSION

### I.    Substantial Evidence Supports High's False Imprisonment Conviction on Count 5

High claims his false imprisonment conviction on count 5 related to the incident at the Intake Grill is not supported by substantial evidence and should be reversed. High argues the evidence shows his physical restraint of T.H. outside the Intake Grill was merely momentary, not for an appreciable length of time. The People respond count 5 was based upon the period of time T.H. was forced to hide inside the Intake Grill to escape High's violence against her, which amounted to an appreciable length of time.

#### A.    Relevant Factual and Procedural History

During opening statements, the prosecutor made the following statement regarding the false imprisonment charge at the Intake Grill: "[T.H.] then flees into the restaurant. And that's a charge. Because false imprisonment is not only keeping someone where they don't want to be, but it's also making them go someplace they don't want to be. She's only going to the Intake Grill to get away from him. And that's another violation."

Before closing arguments, the court inquired whether unanimity instructions were required for the domestic violence charges. The People argued a unanimity instruction was not required because "each domestic violence event [is] completely separate in location and in time; inside the bathroom, later outside on the street, and much later a

13.

mile or so away at the Intake Grill." It was confirmed that there were three separate domestic violence charges listed in the information and verdict forms: one in the bathroom, one in the front yard, and one at the Intake Grill. The court confirmed: "as to the unanimity instruction, do you agree with that as well? That since they're charged as three separate crimes, there's no unanimity issue with regard to the jury - - the unanimity is going to happen when they vote guilty or not guilty on each of the charges." Defense counsel agreed, stating "I can work with that, Your Honor. I - - actually, it does simplify things, and I think it does keep it correct; so we're good."

The prosecutor's closing argument differentiated counts 4 and 5 at the Intake Grill as follows: "And what does he do at the back of the Intake Grill? He puts his hands around her neck and strangles her. And [Officer] Webber sees mark to her neck, which is a traumatic condition. [¶] That's separate in time. It's separate in place. It's a violation of the law. It's Count 4."

Regarding count 5, the prosecutor argued in closing: "Now [T.H.] went into Intake Grill. She wasn't going into Intake Grill to have a beer or one of their side dishes. She was going in there to save her life. She was going into a place that she didn't want to be–but he had just put his hands around her neck. [¶] I submit to you, that's false imprisonment by menace because he had used that–he had shown her that he was perfectly willing to hunt her down again and use that force on her. And she had no choice that–but to go someplace she did not want to be to get away from him."

B. Standard of Review

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Lewis* (2009) 46 Cal.4th 1255,

1289 (*Lewis*), quoting *People v. Lindberg* (2008) 45 Cal.4th 1, 27; *People v. Bolden* (2002) 29 Cal.4th 515, 553.) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Reilly* (1970) 3 Cal.3d 421, 425.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Lewis*, *supra*, at pp. 1289-1290, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; see *People v. Staten* (2000) 24 Cal.4th 434, 460 ["An identical standard applies under the California Constitution."].)

### C. Applicable Law

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236; see *People v. Jennings* (2010) 50 Cal.4th 616, 638-639; *People v. Reed* (2000) 78 Cal.App.4th 274, 280.) In this context, " '[p]ersonal liberty' is violated when the victim is 'compelled to remain where he does not wish to remain, or to go where he does not wish to go.' " (*People v. Von Villas* (1992) 10 Cal.App.4th 201, 255, quoting *People v. Haney* (1977) 75 Cal.App.3d 308, 313.) "If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170." (§ 237; see *People v. Jennings*, *supra*, at pp. 638-639.) False imprisonment does not require confinement in an enclosed space. (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 718 (*Fernandez*); *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1357 (*Dominguez*).) " ' " 'Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment.' " ' "of express or implied force which compels another person to remain where he does not wish to remain, or go where he does not wish to go, is false imprisonment." (*Fernandez*, *supra*, at p. 717; *People v. Agnew* (1940) 16 Cal.2d

655, 659-660 [accord]; *People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123 [accord]; *People v. Rios* (1986) 177 Cal.App.3d 445, 453 [accord].) False imprisonment may be committed either by words or acts. It may be committed by personal violence, or merely by operation upon the will of the falsely imprisoned, or both. (*People v. Agnew*, *supra*, at p. 660; *People v. Zilbauer* (1955) 44 Cal.2d 43, 51; *People v. Reed*, *supra*, at p. 280.)

Thus, all that is necessary to convict on a misdemeanor charge of false imprisonment is that an " ' "individual be restrained of his liberty without any sufficient complaint or authority therefor" ' " under the standards noted above. (*People v. Islas* (2012) 210 Cal.App.4th 116, 122-123 (*Islas*).) To raise the offense to a felony, violence or menace must be established. (*Ibid*; *People v. Haney*, *supra*, 75 Cal.App.3d at p. 313.) Violence is use of force that is greater than reasonably necessary to effect the restraint. (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.) " 'Menace is a threat of harm expressed or implied by words or act.' " (*Islas*, *supra*, at p. 123, quoting *Dominguez, supra,* 180 Cal.App.4th at p. 1359; *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490.) " 'An express threat or use of a deadly weapon is not necessary.' " (*Islas*, *supra*, at p. 123, quoting *Wardell*, *supra*, at p. 1491.)

**D.     Analysis**

High contends that count 5, which alleged false imprisonment at the Intake Grill, is not supported by substantial evidence. High claims count 5 was based on him grabbing T.H. by the neck and pushing her up against a wall outside the Intake Grill. Because T.H. was able to get away from him, High believes the restraint was merely momentary and did not amount to "an appreciable length of time." High argues "The record does not contain evidence on which a reasonable jury could have found beyond a reasonable doubt that [High] falsely imprisoned [T.H.] outside the restaurant." The People, on the other hand, contend that High's "argument fails at its premise because the false imprisonment conviction relating to count 5 was actually based on the appreciable period of time that [T.H.] had to hide in the bar and grill to escape [High's] menace and violence." On

16.

reply, High disagrees with the People's contention that count 5 was based on T.H.'s fleeing into the restaurant, asserting the verdict form referred to the "incident at Intake Grill," which referred to his grabbing of T.H.'s neck and pushing her against a wall outside of Intake Grill rather than T.H. fleeing into Intake Grill. He notes the court did not give a unanimity instruction on count 5.

During trial, but outside the presence of the jury, unanimity instructions were discussed, specifically regarding the domestic violence charges, because there was more than one series of events that could form the basis for the charges. The trial court agreed with the People, without objection from the defense, that unanimity instructions were not required because the information and the verdict forms specified three separate locations tied to the three separate domestic violence charges. Accordingly, no unanimity instruction was given.[9]

The prosecution's theory of the case for false imprisonment charged in count 5 was that High menaced T.H. into hiding in the Intake Grill. During opening statements, the prosecutor explained that the violation in count 5 occurred when T.H. "fle[d] into the restaurant" and was "going into the Intake Grill to get away from [High]." The

---

[9] It is also worth noting, because of the constitutional right to a unanimous jury, " 'if one criminal act is charged, but the evidence tends to show the commission of more than one such act, "*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must" unanimously agree that the defendant committed the same specific criminal act.' " (*People v. Brown* (2017) 11 Cal.App.5th 332, 341; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 ["when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act"]; *People v. Brugman* (2021) 62 Cal.App.5th 608, 627 [same].) " 'The prosecution can make an election by "tying each specific count to specific criminal acts elicited from the victims' testimony" – typically in opening statement and/or closing argument.' " (*Brugman*, *supra*, at p. 627; *People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382.) " 'Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' " (*Brugman*, *supra*, at p. 627, quoting *People v. Brown*, *supra*, at p. 341.)

17.

prosecutor explained to the jury that the false imprisonment is "not only keeping someone where they don't want to be, but it's also making them go someplace they don't want to be." In closing argument, the prosecutor again explained that the false imprisonment at count 5 occurred when T.H. went into the Intake Grill. The prosecutor stated, "She was going in there to save her life. She was going into a place that she didn't want to be – but he had just put his hands around her neck." The prosecutor explained that it was false imprisonment by menace because High had just shown her he was willing to use force on her and she had no choice but to get away. Moreover, the prosecutor told the jury that the crime regarding the choking incident behind the Intake Grill had been charged in a separate count, count 4, corporal injury to spouse.

Upon review of the record, we conclude there is substantial evidence from which a reasonable trier of fact could find High guilty of false imprisonment by violence or menace beyond a reasonable doubt on count 5. (See *Lewis*, *supra*, 46 Cal.4th at p. 1289.) The evidence at trial was that High caught up with T.H. behind the Intake Grill, grabbed her by the throat and forced her up against the back of the wall. She was able to get away from High and went inside the Intake Grill to hide. T.H. waited inside for her friend to pick her up. The jury could reasonably infer based on High's actions causing physical harm to T.H. behind the Intake Grill that High used violence or menace to effectuate the false imprisonment. (See *Islas*, *supra*, 210 Cal.App.4th at pp. 122-123.)

On this record, there is substantial evidence that T.H.'s personal liberty was violated since she was not free to leave the Intake Grill. After T.H. explained to her friends inside the Intake Grill that High had followed her there, they confirmed that High was outside waiting for her. Because High was observed waiting outside, the evidence demonstrates she was " 'compelled to remain where [s]he [did] not wish to remain, or to go where [s]he [did] not wish to go.' " (See *People v. Von Villas*, *supra*, 10 Cal.App.4th at p. 255.) Our Supreme Court explained "the tort [of false imprisonment] consists of the ' "nonconsensual, intentional confinement of a person, without lawful privilege, for an

18.

appreciable length of time, however short." ' " (*Fermino v. Fedco, Inc*. (1994) 7 Cal.4th 701, 715.) The length of time can be as brief as 15 minutes. (*Ibid*.) While inside the Intake Grill, T.H. took time to explain to her friends who were employed there that High was following her and that she needed to hide. The employees took the time to confirm that High was still outside looking for T.H. T.H. then waited for a friend to pick her up. We conclude the record contains substantial evidence from which a reasonable trier of fact could find beyond a reasonable doubt T.H.'s liberty was restrained for an appreciable length of time.

We are not persuaded by High's argument that because the verdict form for count 5 states the false imprisonment occurred "at the Intake Grill," it means *outside* the Intake Grill and only pertains to High's actions behind the Intake Grill. Any risk the jurors may have relied on different incidents to find High guilty of false imprisonment in count 5 was alleviated by the prosecution's clear election during opening statements and closing arguments. The prosecution remedied any potential confusion by explaining in opening statements and closing argument that the false imprisonment charge in count 5 at the Intake Grill was based on T.H. feeling forced to hide *inside* the Intake Grill.

We further reject High's assertion that his restraint of T.H. was merely a momentary event and not for " 'some appreciable length of time, however short.' " (See *People v. Rios*, *supra*, 177 Cal.App.3d at p. 453, dis. opn. of White, J.) The cases High relies upon are inapposite. In *People v. Arnold* (1992) 6 Cal.App.4th 18, the victim wanted to go on a run with the defendant hoping he would kiss her. When he said " 'come here,' " he grabbed her buttocks, kissed her and put both his hands underneath her clothing, touching her breasts for a couple of seconds. The victim pushed him away and told him no. (*Id*. at p. 28.) The defendant was charged with sexual battery and the court found the momentary grabbing of the victim before she successfully pulled away was insufficient to establish unlawful restraint in sexual battery. (*Id*. at p. 29.) Unlike in *Arnold,* the facts here lack the initially desired contact, nor was T.H. able to regain her

19.

full freedom since she had to hide from High in the Intake Grill. In *People v. Martinez* (1984) 150 Cal.App.3d 579,[10] the victim successfully prevented the defendant's attempt to grab her by the hair to gain control of her as a hostage. The evidence was insufficient to establish the crime of kidnapping for extortion. (*Id*. at p. 602.) Here, T.H. was able to get away from High's physical hold but was forced to hide from High inside the Intake Grill.

## II. The Trial Court Did Not Prejudicially Err By Not Instructing the Jury Sua Sponte on the Lesser Included Offense of Attempted False Imprisonment

Alternately, High contends the trial court prejudicially erred by failing to instruct sua sponte on the lesser included offense of attempted false imprisonment. And that the trial court's failure to instruct on the lesser included offense was prejudicial. The People disagree arguing there was no sua sponte duty to instruct on attempted false imprisonment because attempted false imprisonment is not a lesser included offense under either the elements test or the accusatory pleading test. We conclude the trial court did not have a sua sponte duty to instruct on attempted false imprisonment.

### A. Relevant Procedural History

The trial court instructed the jury regarding false imprisonment as follows:

"The Defendant is charged in Counts 2 and 5 with false imprisonment by violence or menace in violation of Penal Code Section 273(a). [¶] To prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant intentionally and unlawfully confined someone or caused that person to be confined by violence or menace. And, two, the Defendant made the other person stay or go somewhere against the person's will. [¶] Violence means using physical force that is greater than force reasonably necessary to restrain someone. [¶] Menace means a verbal or physical threat of harm. The threat of harm may be expressed or implied. [¶] An act is done against a person's will if that person does not

---

**10**     Disapproved of on other grounds in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10.

20.

consent to the act.  In order to consent, a person must act freely and voluntarily and know the nature of the act.  [¶]  False imprisonment does not require that the person be restrained, be confined in a jail or prison.

"False imprisonment is a lesser-included offense of the crime of false imprisonment by violence or menace as charged in Counts 2 and 5. [¶]  To prove false imprisonment, the evidence must show that, one, the Defendant intentionally and unlawfully confined a person.  And, two, the Defendant's acts made that person stay or go somewhere against that person's will.  [¶]  An act is done against that person's will if that person does not consent to the act.  In order to consent, a person must act freely and voluntarily and know the nature of the act.  [¶]  False imprisonment does not require that the person be restrained be confined in a jail or prison.

"Counts 1, 3, and 4, false imprisonment, is a lesser-included offense to false imprisonment by violence and – or menace as charged in Counts 2 and 4.  [¶]  It is up to you to decide the order in which you consider each crime and the relevance, but I can accept a verdict of guilty of a lesser crime only if you have found the Defendant not guilty of the according greater count.  But each charged count has a lesser-included offense."

High did not request, and the court did not instruct, on attempted false imprisonment as a lesser included offense.

### B.    Standard of Review

"On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense."  (*People v. Souza* (2012) 54 Cal.4th 90, 113.)  "An appellate court applies the independent or de novo standard of review to the failure by the trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense."  (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### C.    Legal Principles

"A trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which [High] is charged 'only if [citation] "there is evidence" ' [citation], specifically '*substantial* evidence' [citation] ' "which, if accepted …, would absolve [High] from guilt of the greater offense"

21.

[citation] *but not the lesser.'* " (*People v. Waidla*, *supra*, 22 Cal.4th at p. 733; *People v. Cole* (2004) 33 Cal.4th 1158, 1218 [same].)  " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Licas* (2007) 41 Cal.4th 362, 366, quoting *People v. Birks* (1998) 19 Cal.4th 108, 117-118.)  Error in failing to give a lesser included instruction is reviewed for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 standard.  (*People v. Breverman* (1998) 19 Cal.4th 142, 165, abrogated on another ground by amendment of § 189.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  (§ 21a; *People v. Ross* (1988) 205 Cal.App.3d 1548, 1554-1555 (*Ross*)["i.e., an overt ineffectual act which is beyond mere preparation yet short of actual commission of the crime"].)  Mere preparation such as planning or mere intention to commit a crime is insufficient to constitute an attempt.  It requires "[s]ome act done toward the ultimate accomplishment of the intended crime."  (*People v. Siu* (1954) 126 Cal.App.2d 41, 43; *Ross*, *supra*, at p. 1554.)

" 'A defendant may be convicted of an uncharged crime if, but only if, the uncharged crime is necessarily included in the charged crime.  [Citations.]  ...  " 'This reasoning rests upon a constitutional basis:  "Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial."  [Citation.]' "  [Citation.]  The required notice is provided as to any charged offense and any lesser offense that is necessarily committed when the charged offense is committed.' "  (*People v. Sloan* (2007) 42 Cal.4th 110, 116; see § 1159.)

"[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory

pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks, supra,* 19 Cal.4th at pp. 117-118, fn. omitted; accord *People v. Lopez* (2020) 9 Cal.5th 254, 269-270 [" 'To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." ' "].)

Courts have made clear that false imprisonment is a general intent crime, because the statutory definition "includes only a description of the particular act without any reference to an intent to do a further act or achieve a further consequence." (*People v. Swanson* (1983) 142 Cal.App.3d 104, 109; see also *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1399-1400; *Fernandez, supra*, 26 Cal.App.4th at pp. 716-718.)

In *People v. Bailey* (2012) 54 Cal.4th 740 (*Bailey*), the California Supreme Court explained that although an attempt to commit a crime is generally a lesser included offense of the completed crime, that rule does not apply where "the attempted offense includes a particularized intent that goes beyond what is required by the completed offense." (*Id.* at p. 753; see also *People v. Mendoza* (2015) 240 Cal.App.4th 72, 83.) Pursuant to section 21a, an attempt to commit a crime "consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." "Because of the different mental states required, a defendant could be guilty of the completed offense but not the attempt," and therefore a specific intent attempt crime is not a lesser included offense of a general intent completed crime. (*People v. Mendoza*, *supra*, at p. 83; see *People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248 (*Braslaw*) [the attempt of a general intent crime requires proof of an additional

23.

element and is therefore not a lesser included offense]; *Bailey*, *supra*, at p. 753 [same]; *People v. Ngo* (2014) 225 Cal.App.4th 126, 156 ["when the completed offense is a general intent crime, an attempt to commit that offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense"]; *People v. Strunk* (1995) 31 Cal.App.4th 265, 271 ["an attempt is a specific intent crime and does not fit within the definition of a necessarily included offense of a general intent crime"].)

### D.    Analysis

High claims he attempted but was unable to complete the false imprisonment of T.H. behind the Intake Grill because she broke away from his momentary restraint of her. High claims that "[e]ven if there is substantial evidence that [High] restrained [T.H.] at the restaurant for an appreciable length of time in order to be guilty of false imprisonment, there is also substantial evidence that [High] attempted to complete the crime of false imprisonment but … was unable to do so because he was only able to restrain [T.H.] for mere moments before she broke away." As such, High contends the trial court erred by failing to instruct sua sponte on the lesser included offense of attempted false imprisonment. High argues CALCRIM No. 1240 identifies attempted false imprisonment as a lesser included offense of false imprisonment. High argues that there was sufficient evidence in the record from which the jury could have found that High was only guilty of the lesser included offense of attempted false imprisonment and not guilty of the greater offense of false imprisonment. And that the failure to instruct on attempted false imprisonment was prejudicial. High claims the trial court's failure to instruct on attempted false imprisonment was prejudicial given the evidence High restrained T.H. for mere moments behind the Intake Grill.

The People disagree, arguing the court did not have a sua sponte duty to instruct on attempted false imprisonment because attempted false imprisonment is not necessarily

a lesser included offense because it requires specific intent, and false imprisonment only requires general intent. Accordingly, attempted false imprisonment fails both the elements test and the accusatory pleading test. The People also contend the court did not have a duty to instruct on attempted false imprisonment because there was substantial evidence that High was guilty of false imprisonment but not guilty of attempted false imprisonment.

Our Supreme Court has held that "where the attempted offense includes a particularized intent that goes beyond what is required by the completed offense," it is not a lesser included offense. (*Bailey*, *supra*, 54 Cal.4th at p. 753.) False imprisonment is a general intent crime. (*People v. Swanson*, *supra*, 142 Cal.App.3d at p. 109.) An attempt is a specific intent crime, and attempted false imprisonment requires the specific intent to commit false imprisonment. (§ 21a; see *Braslaw*, *supra*, 233 Cal.App.4th at p. 1249.) Therefore, because of the different mental states required, the specific intent crime of attempted false imprisonment is not a lesser included offense of the general intent crime of false imprisonment. (See *People v. Mendoza*, *supra*, 240 Cal.App.4th at p. 83; see *Braslaw*, *supra*, at p. 1248.) Thus, under the elements test, attempted false imprisonment is not a lesser included offense of false imprisonment.

"The accusatory pleading test arose to ensure that defendants receive notice before they can be convicted of an uncharged crime." (*People v. Reed* (2006) 38 Cal.4th 1224, 1229; *People v. Lopez*, *supra*, 9 Cal.5th at p. 270.) Because a defendant is entitled to notice of the charges, the specific language of the accusatory pleading must adequately warn the defendant that the People will seek to prove the elements of the lesser offense. (*People v. Reed, supra,* at p. 1229.) The information alleges High "unlawfully violate[d] the personal liberty" of T.H. It does not charge High with having specific intent to commit the offense. As such, attempted false imprisonment is also not a lesser included offense of false imprisonment under the accusatory pleading test.

25.

Although High cites to CALCRIM No. 1240 to argue attempted false imprisonment is a lesser included offense of false imprisonment, the jury instruction is not the law or binding authority. (See *People v. Mojica* (2006) 139 Cal.App.4th 1197, 1204, fn. 4 [pattern jury instructions are not the law and are not binding]; *People v. Alvarez* (1996) 14 Cal.4th 155, 217; *People v. Runnion* (1994) 30 Cal.App.4th 852, 858.) And none of the cases High cites state that attempted false imprisonment is a necessarily lesser included offense of false imprisonment. Including *People v. Ross*, *supra*, 205 Cal.App.3d 1548, cited by High, which only addresses whether a present ability to complete the offense is necessary to convict on attempted false imprisonment. (*Id*. at pp. 1553-1556.) Ultimately, *Bailey* is controlling and compels the conclusion that the specific intent crime of attempted false imprisonment is not a lesser included offense of the charged general intent crime of false imprisonment.

Even if attempted false imprisonment were a lesser included offense of false imprisonment, the trial court did not have an obligation to instruct on attempted false imprisonment. "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than charged." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 154.) As discussed above, there is no question that all the elements of the charge of false imprisonment by violence or menace were present in count 5. And there is no evidence that the offense was less than charged.

It is also important to note that the jury was already given a lesser included offense option of misdemeanor false imprisonment but rejected that option in favor of the charged offense. In such cases, the jury is not "forced [into] 'an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.' " (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 262, disapproved on other grounds in *People v. Smith* (2013) 57 Cal.4th 232, 242; see *People v. Dominguez* (1992)

11 Cal.App.4th 1342, 1353 [defendant charged with robbery; failure to instruct on lesser included offense of grand theft was harmless because jury was instructed on lesser included offense of petty theft and was thus not "put to an 'unwarranted all-or-nothing choice' "]; cf. *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 571 [defendant charged with assault with a firearm; failure to instruct on lesser related offense of brandishing was harmless where the jury "was not faced with an all-or-nothing choice" because it was instructed on other lesser related offenses].)

The California Supreme Court applied these principles in *People v. Rogers* (2006) 39 Cal.4th 826, where the defendant was charged with first degree murder. The *Rogers* court held that the trial court should have instructed the jury on the express malice form of second degree murder. (*Id.* at pp. 866-867.) However, the error was harmless because the jury had been given other lesser offense options, including the implied malice form of second degree murder, but convicted the defendant of first degree murder. (*Id.* at pp. 867-868.) The *Rogers* court similarly found that any error in failing to give an involuntary manslaughter instruction was harmless because the jury had rejected the lesser options of second degree murder and voluntary manslaughter. (*Id.* at p. 884; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1156 [failure to give involuntary manslaughter instruction harmless where jury found defendant guilty of first degree murder "in the face of exhaustive instructions pertaining to the lesser included offenses of second degree murder and voluntary manslaughter"].) Therefore, even assuming, arguendo, the trial court erred in failing to instruct on attempted false imprisonment, such failure would be harmless since the jury was given another reasonable lesser offense option but rejected it in favor of the charged offense.

## III. The Trial Court Did Not Prejudicially Err in Allowing Testimony Regarding Prior Domestic Violence Incidents

High contends his "conviction should be reversed because the trial court prejudicially abused its discretion and violated [his] federal due process right to a

fundamentally fair trial [citation] by admitting extensive testimony about six prior domestic violence incidents." The People argue that prior incidents of domestic violence are admissible under Evidence Code section 1109 and that the trial court did not abuse its discretion in allowing the evidence after finding its probative value outweighed any undue prejudice. We agree with the People and conclude the trial court did not abuse its discretion in allowing testimony regarding prior incidents of domestic violence.

## A. Relevant Factual Background

Through a motion in limine, the People sought to admit High's prior instances of domestic violence under Evidence Code section 1109. The domestic violence incidents consisted of four uncharged instances and two charged instances. Defense sought to exclude evidence regarding prior acts of domestic violence under Evidence Code section 352. High claimed that "the only reason to get it in would be to inflame the passion of the jurors so as to influence how they decide my client's case. [¶] And it is – there's no – well, minimal – minimal probative value as to whether the allegations in this Complaint actually happened that could be proffered from that evidence."

The prosecution argued that "Everything that [defense counsel] said is contrary to Penal Code Section 1109. It goes to propensity. It's highly relevant. Most of the acts are the same victim; so I – I – other than his 352 argument, if the Code calls for it, then it's permissible. And I'd ask the Court to grant the motion."

The trial court responded, stating, "If we went with your logic, [defense counsel], that code section would have no use ever." The court explained it "under[stood] 352 applies, but I'm going to allow the evidence."

In closing arguments, the prosecutor argued the following: "For nine years, by my math, [High has] been unable to control his violent impulses toward his partners, unable to handle jealousy issues. And we're not here to be counselors for him. But he's been enable[d]. And it's been chronicled. [¶] And he has an MO he likes to use. He likes to use strangulation. He likes to use punches. He likes to use leg sweeps. [¶] And over

28.

those nine years, he's caused injuries to [T.H.]. Over those nine years, including [R.D.], he's incited situations where people have had to come out and deal with him. [O]ver that nine-year period, he's been convicted of domestic violence and faced consequences. [⁋] And what has all that taught him on the evening of February 13th, 2019? Nothing. Not a thing. He hasn't accepted responsibility or learned a lesson from his past conduct."

## B.    Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.) Specifically, the admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion. (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138, citing Evid. Code, §§ 352, 1109; *People v. Fitch* (1997) 55 Cal.App.4th 172, 183.)

## C.    Applicable Law

Character or propensity evidence, including evidence of a person's prior conduct, is generally inadmissible to prove the person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) However, "[t]he Legislature has … created specific exceptions to the rule against admitting character evidence in cases involving sexual offenses ([Evid. Code, ]§ 1108, subd. (a)), and domestic violence, elder or dependent abuse, or child abuse ([Evid. Code, ]§ 1109, subd. (a)(1)-(3))." (*Villatoro*, *supra*, at p. 1159.)

Evidence Code section 1109 provides, in relevant part, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).) The code section "permits the introduction of evidence of prior domestic violence to demonstrate a defendant's propensity for such behavior." (*Doe v. Busby* (9th Cir. 2011) 661 F.3d 1001, 1023; *People v. Kerley* (2018) 23 Cal.App.5th 513,

539 [evidence of prior domestic violence authorized to show the defendant had a propensity for abuse]; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233 (*Brown*) [evidence of a prior act may be introduced as propensity evidence].) "[I]n enacting Evidence Code section 1109, the Legislature found that in domestic violence cases evidence of prior acts is particularly probative in demonstrating the propensity of the defendant. ' "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked" ' (citation), (quoting Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, [at] pp. 3-4.)" (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 705-706; see *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028 (*Hoover*).) "Based on the foregoing, the California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

However, Evidence Code section 1109 permits a trial court to exclude evidence of other crimes under Evidence Code section 352. (Evid. Code, § 1109, subd. (a)(1).) Evidence Code section 352 gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124

(*Rodrigues*), abrogated on another ground in *People v. Leon* (2020) 8 Cal.5th 831, 848.) "Evidence is substantially more prejudicial than probative (citation) [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.)

A trial court's exercise of its discretion under section 352 is not disturbed on appeal except on a showing that the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*Rodrigues*, *supra*, 8 Cal.4th at p. 1124; *Brown*, *supra*, 192 Cal.App.4th at p. 1233; *People v. Lewis* (2001) 26 Cal.4th 334, 374 (*Lewis*).)

**D.     Analysis**

High claims the trial court abused its discretion when it admitted testimony regarding six prior domestic violence incidents, over his objection under Evidence Code section 352. High asserts the prosecutor was allowed to present an overwhelming amount of evidence about four uncharged and two charged domestic violence incidents. High argues that because the evidence regarding the prior incidents took up 64 percent of T.H.'s direct examination, 37 percent of the total direct examination, and 28 percent of the prosecutor's closing argument, it exceeded its probative value and became prejudicial. High contends this error requires reversal because it significantly bolstered the People's weak case based on T.H.'s inability to remember two of the three incidents at trial. The People disagree contending the evidence was highly probative, admissible to demonstrate propensity evidence and pattern of abuse on the domestic violence charges, and was not outweighed by undue prejudice.

31.

High fails to demonstrate the trial court acted in an arbitrary, capricious or patently absurd manner when it admitted evidence of prior domestic violence incidents. (See *Rodrigues*, *supra*, 8 Cal.4th at p. 1124; *Lewis, supra,* 26 Cal.4th at p. 374.) First, we note the evidence of prior instances of domestic violence was statutorily admissible under Evidence Code section 1109 since High was charged with three counts involving domestic violence. Second, the trial court did not abuse its discretion in determining the probative value of the evidence was not substantially outweighed by the probability its admission would create undue prejudice. "[W]hen ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213, citing *People v. Lucas* (1995) 12 Cal.4th 415, 448-449; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.) Here, the court expressed on the record that it considered Evidence Code section 352 in its ruling and, nevertheless, decided to admit the evidence.

Further, the evidence of prior incidents showed High had a propensity for domestic violence, which is particularly probative in domestic violence cases. (See *People v. Kerley*, *supra*, 23 Cal.App.5th at p. 539 [evidence of prior domestic violence authorized to show defendant had a propensity for abuse]; *Brown*, *supra*, 192 Cal.App.4th at p. 1233 [evidence of a prior act may be introduced as propensity evidence]; *People v. Poplar, supra,* 70 Cal.App.4th at p. 1139 [evidence showing a defendant's propensity for violence against domestic partners is "extremely probative"]; *People v. Cabrera*, *supra*, 152 Cal.App.4th at pp. 705-706; *Hoover*, *supra,* 77 Cal.App.4th at pp. 1027-1028; *People v. Megown* (2018) 28 Cal.App.5th 157, 168).) The evidence of prior incidents also demonstrated High had modus operandi or a repeated pattern to his violence; specifically, grabbing his victim by the throat and sweeping their legs so they fall backward.

High fails to demonstrate "the prejudicial effect of the evidence clearly outweighed its probative value." (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1396.) Although High suggests a large portion of testimony at trial was spent on prior incidents of domestic violence, the probative value of the evidence is not substantially outweighed by any risk the evidence consumed an undue amount of time or created a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (*Brown*, *supra*, 192 Cal.App.4th at p. 1233; *Hoover*, *supra*, 77 Cal.App.4th at pp. 1028-1029.) As such, we conclude the trial court did not abuse its discretion in admitting evidence of prior acts of domestic violence.

## IV. The Trial Court Committed *Yurko* Error By Accepting High's Admissions to His Prior Convictions Without Providing Any Warning or Advisement

High contends the trial court committed *Yurko*[11] error by accepting his admissions to a prior strike conviction and a prior domestic violence conviction without the proper advisements; and contends that his admissions must be vacated. The People concede the trial court did not obtain express waivers before taking High's admissions of his prior convictions, and committed *Yurko* error, but maintain that the error was harmless. We agree with High that the trial court committed *Yurko* error and the prior conviction findings must be vacated.

### A. Relevant Procedural History

The information charging High alleged he had a prior domestic violence conviction in violation of section 273.5 and a prior strike conviction of first degree burglary in violation of section 459 out of a 2016 Tuolumne Superior Court case No. CRF49073.

After the jury was sworn, the trial court had a preliminary conference with the parties. The court stated it understood there were some stipulations to put on the record.

---

[11] *Yurko*, *supra*, 10 Cal.3d 857.

The prosecutor replied, "Yes, Your Honor. It's the People's understanding [High] is alleged to have a prior domestic violence conviction as well as a prior serious or violent felony. [¶] It's my understanding [High] is going to be admitting those. I wanted to do that just so we didn't have to worry about that." Defense counsel affirmed that "[t]hose are stipulated, Your Honor, both." The trial court said, "Okay," thanked counsel, and asked if there was anything else to put on the record. The prosecutor responded, "I'm thinking — I would ask the Court to specifically ask [High] each one and have him admit or deny."

The trial court subsequently spoke with High, and the following colloquy occurred:

"THE COURT: So I'm going to ask – [High], there was an allegation that you have had prior domestic violence convictions as well as a prior serious or violent felony. Do you admit both of those?

"[HIGH]: Yes, sir."

The prosecutor later asked for the court to take judicial notice of its records for case No. CRF49073, the case that formed the basis for the prior conviction allegations. The court asked defense counsel for his position on judicial notice. Counsel first indicated that he believed the court could take judicial notice. There was then some discussion about how this would play out, including that the jury would be informed that the fact of the conviction had been proven. Based on that discussion, High's attorney indicated he would like additional time to consider the issue and "doublecheck" on some question he may have.

The court indicated it was inclined to grant the motion for judicial notice, absent any authority to the contrary, but that it was open to whatever arguments High might wish to make on the matter after doing further research. The next morning, defense counsel stated that after further research, he was submitting on the issue of judicial notice. The court asked if he meant there was no objection to judicial notice, and counsel

34.

clarified there was no objection. The prosecutor stated he had also obtained a certified docket for an out-of-county prior domestic violence offense, and he intended to ask the court to take judicial notice of that prior conviction as well. High did not object and the court took judicial notice of the prior convictions.

High's previous conviction from case No. CRF49073 was resolved on March 21, 2016, by a fully-advised plea.

### B. Applicable Law

The United State Supreme Court in *Boykin v. Alabama* (1969) 395 U.S. 238, 239 held "[i]t was error ... for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." (*Id*. at pp. 242, 244.) The court explained its holding in these words: "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination.... [Citations.] Second, is the right to trial by jury. [Citations.] Third, is the right to confront one's accusers. [Citations.] We cannot presume a waiver of these three important federal rights from a silent record." (*Id*. at p. 243.) In *People v. Tahl* (1969) 1 Cal.3d 122 (*Tahl*),[12] the California Supreme Court interpreted *Boykin v. Alabama* as requiring that "each of the three rights mentioned—self-incrimination, confrontation, and jury trial—must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea." (*Id*. at p. 132; *People v. Howard* (1992) 1 Cal.4th 1132, 1176 (*Howard*), abrogated on other grounds as stated in *People v. Rhoades* (2019) 8 Cal.5th 393, 425, fn. 12.)

In *Yurko*, the California Supreme Court subsequently extended *Tahl*'s requirement of express admonitions and waivers to cases in which the defendant admits the truth of a

---

[12] Superseded by statute on another ground as stated in *People v. Carty* (2003) 110 Cal.App.4th 1518, 1523-1524.

prior conviction allegation that subjects him to increased punishment. (*People v. Cross* (2015) 61 Cal.4th 164, 170 (*Cross*); *Howard, supra,* 1 Cal.4th at p. 1177.) Our high court held that the admission of a prior was sufficiently like a plea of guilty to require the same procedural protections. (*Yurko, supra,* 10 Cal.3d at p. 863.) Therefore, when a defendant admits to the truth of prior convictions that subject him to increased punishment, he or she must be informed of the right to trial by jury, the right against self-incrimination, and the right to confront one's accusers. (*Yurko, supra,* at pp. 863-864; *Cross, supra,* at pp. 170-171, 174-179; *People v. Guzman* (1988) 45 Cal.3d 915, 968 (*Guzman*) [law is well settled], criticized on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069; see *Boykin v. Alabama, supra,* 395 U.S. at pp. 243-244; see *Tahl, supra,* 1 Cal.3d at pp. 130-133.) Failure to explicitly inform a defendant of these rights, and solicit a waiver of them, is error under *Yurko.* (See *Yurko, supra,* at pp. 863-864.)

*Yurko* error is not reversible per se. (*Cross, supra,* 61 Cal.4th at p. 171.) "Instead, the test for reversal is whether 'the record affirmatively shows that [the guilty plea] is voluntary and intelligent under the totality of the circumstances.' " (*Ibid.,* citing *Howard, supra,* 1 Cal.4th at p. 1175.)

### C.    Analysis

High contends the trial court committed *Yurko* error when it accepted High's admissions to prior convictions without informing High of his rights and not obtaining a waiver of them. Specifically, the trial court did not inform High of the privilege against self-incrimination, the right to a trial, and the right to confront one's accusers; nor did it obtain a personal waiver of each of those rights. The trial court also failed to inform High of the penal consequences of admitting the prior convictions. As such, High contends the record fails to show his admission was voluntary and intelligent under the totality of the circumstances, and therefore, the error is reversible. The People concede

that the trial court committed *Yurko* error when it accepted High's stipulations to his prior convictions without an advisement or waiver of his rights. However, the People contend the error was harmless and does not require reversal because, under the circumstances, there was no reasonable probability that High would not have admitted the convictions had he been properly advised. Further, the People contend the convictions would have been proven true.

Here, High admitted two prior convictions that subjected him to increased punishment. High admitted he had a previous domestic violence conviction under section 273.5 that occurred within the past seven years. Under section 273.5, subdivision (f)(2), "[a]ny person convicted of a violation of this section for acts occurring within seven years of a previous conviction under subdivision (e) of Section 243 shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to ten thousand dollars ($10,000), or by both that imprisonment and fine." By admitting his prior domestic violence conviction, High subjected himself to increased punishment. Additionally, High admitted he had a previous strike conviction, which increased his punishment under the three strikes law. Because High admitted "every fact necessary to imposition of the additional punishment other than conviction of the underlying offense" (*People v. Adams* (1993) 6 Cal.4th 570, 580), he was entitled to receive *Boykin-Tahl* warnings before he made these admissions. (See *Cross*, *supra*, 61 Cal.4th at p. 174.) As such, the trial court erred when it failed to inform High he had the right to a trial, the right against self-incrimination and the right to confront his accusers, and when it failed to obtain High's waiver of these rights. (See *Yurko*, *supra*, 10 Cal.3d at pp. 863-864; *Cross*, *supra*, at pp. 170-171, 174-179.)

While the parties agree that the trial court erred under *Yurko*, they disagree as to the applicable standard of review to determine whether the error requires reversal. The People contend that such error is subject to the harmless error analysis under the "reasonable probab[ility]" standard of *People v. Watson, supra,* 46 Cal.2d at p. 836, set

37.

forth in *Guzman*, *supra*, 45 Cal.3d at page 968.  However, years after its opinion in *Guzman*, the California Supreme Court clarified the standard for determining whether *Yurko* error requires reversal in *Howard*, which it has since reiterated.[13]  The *Howard* court held that "*Yurko* error involving *Boykin*/*Tahl* admonitions should be reviewed under the test used to determine the validity of guilty pleas under the federal Constitution.  Under that test, a plea is valid if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances."  (*Howard*, *supra*, 1 Cal.4th at p. 1175; see *Cross*, *supra*, 61 Cal.4th at p. 179; *People v. Mosby* (2004) 33 Cal.4th 353, 360-361 (*Mosby*).)

"In replacing the old rule, the focus was shifted from whether the defendant received express rights advisements, and expressly waived them, to whether the defendant's admission was intelligent and voluntary because it was given with an understanding of the rights waived."  (*Mosby*, *supra*, 33 Cal.4th at p. 361.)  "Now, if the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances."  (*Ibid*.)

"Truly silent-record cases are those that show no express advisement or waiver of the *Boykin-Tahl* rights before a defendant's admission of a prior conviction."  (*Mosby*, *supra*, 33 Cal.4th at pp. 361-362; *People v. Stills* (1994) 29 Cal.App.4th 1766, 1769-1771 [without any rights advisements or waivers the defendant was asked if he admitted

---

[13]      In *Howard*, the California Supreme Court noted most of its previous statements, if only by analogy or in dictum, supported the defendant's position that *Yurko* error was reversible per se (regardless of prejudice, with *Guzman* being the exception).  (*Howard*, *supra*, 1 Cal.4th at pp. 1174-1175.)  However, it concluded, the "overwhelming weight of authority no longer supports the proposition that the federal Constitution requires reversal when the trial court has failed to give explicit admonitions on each of the so-called *Boykin* rights," it had "no choice but to revisit [its] prior holdings."  (*Id*. at p. 1175.)

priors]; see also *People v. Campbell* (1999) 76 Cal.App.4th 305, 309-310[14] [after conviction by jury on the substantive offense, the defendant, who received no admonishments and gave no waivers, admitted each of four alleged priors]; *People v. Moore* (1992) 8 Cal.App.4th 411, 417 [after conviction by jury on the substantive offense, the defendant, who received no admonishments and gave no waivers, admitted a prior conviction of assault with a deadly weapon and a prior prison term].)  In each of these above cases, defendants were not told on the record of their right to a trial to determine the truth of the prior conviction allegation, nor did they expressly waive their right to a trial.  Our high court in *Mosby* concluded that "[i]n such cases, in which the defendant was not advised of the right to have a trial on an alleged prior conviction, we cannot infer that in admitting the prior the defendant has knowingly and intelligently waived that right as well as the associated rights to silence and confrontation of witnesses." (*Mosby*, *supra*, at p. 362.)

Here, the record contains no indication that High's stipulation was knowing and voluntary.  When accepting High's stipulation, the trial court did not ask High whether he had discussed the stipulation with his lawyer or discussed his right to a fair determination of the prior conviction allegation.  (See *Cross*, *supra*, 61 Cal.4th at p. 180; cf. *Mosby*, *supra*, 33 Cal.4th at pp. 357-358.)  The trial court failed to make any admonitions on the record with respect to any of the three constitutional rights preceding High's admission to the truth of his prior conviction allegations.  Nor did High acknowledge and waive any of his rights on the record.  This is the type of silent record condemned in *Boykin v. Alabama* and *Mosby*.  (See *Boykin v. Alabama*, *supra*, 395 U.S. at p. 243; *Mosby*, *supra*, at pp. 361-362.)  While High's prior experiences with the criminal justice system may suggest High has an understanding and knowledge of his legal rights, it does not

---

**14**   The statement in *People v. Campbell* that "[u]nder *Howard*, we are not permitted to imply knowledge and a waiver of rights on a silent record" was disapproved in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.

39.

necessarily mean he understood he faced increased punishment by stipulating to his prior convictions. Especially here where High made the stipulations before his trial began.

Therefore, upon review of the record, we cannot conclude the record affirmatively shows that High's stipulation to his prior convictions was voluntary and intelligent under the totality of the circumstances. (See *Cross*, *supra*, 61 Cal.4th at p. 171; *Mosby*, *supra*, 33 Cal.4th at pp. 361-362.) Accordingly, High's stipulations must be set aside. (See *Cross*, *supra*, at p. 180.)

The People contend they should be entitled to retry these allegations. We agree. In a "noncapital case, the state and federal prohibitions against double jeopardy do not apply" to bar the retrial of a prior serious felony conviction and where the evidence at the original trial was insufficient. (*People v. Monge* (1997) 16 Cal.4th 826, 829, 843, 845 (*Monge*) [where there was insufficient evidence to prove prior conviction, double jeopardy did not bar retrial, but prosecution had to present additional evidence].) The United States Supreme Court affirmed *Monge* and concluded the bar of double jeopardy does not apply to noncapital sentencing determinations based on High's prior criminal history. (*Monge v. California* (1998) 524 U.S. 721, 731-732; *Cherry v. Superior Court* (2001) 86 Cal.App.4th 1296, 1301.) A retrial of whether High suffered the alleged prior convictions is proper here. (See *People v. Scott* (2000) 85 Cal.App.4th 905, 914, citing *People v. Morton* (1953) 41 Cal.2d 536, 544-545 [when a true finding as to a prior conviction allegation is reversed due to insufficiency of the evidence, the proper procedure is to remand for a retrial on the allegation].) As such, the matter is remanded for retrial on High's alleged prior domestic violence conviction and prior strike conviction, and for resentencing.

## V. Penal Code Section 654

High contends his conviction on counts 1 and 2 violate section 654's prohibition against multiple punishment for a single act. High claims the sentence should be

reversed and the matter remanded for resentencing for the trial court to determine which term should be stayed. The People agree that punishment for both counts 1 and 2 violate section 654 and that one of the terms must be stayed. We agree and remand the matter for resentencing in order for the trial court to determine which term should be stayed.

## A.    Relevant Factual Background

Both count 1 (corporal injury to a spouse, § 273.5, subd. (a)) and count 2 (false imprisonment, § 236) stem from the incident in the bathroom. At sentencing, the trial court imposed concurrent sentences on counts 1 and 2. The trial court did not consider whether section 654 applied to counts 1 and 2, nor was the potential applicability of section 654 mentioned in either the probation report or the parties' arguments at sentencing.

## B.    Standard of Review and Legal Principles

"Section 654 prohibits multiple punishment for any single act or omission. If a single action or course of conduct by a defendant violates multiple laws, 'the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, [but] the trial court may impose sentence for only one offense.' " (*People v. Sek* (2022) 74 Cal.App.5th 657, 673, quoting *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) Until recently, the law required trial courts to impose sentence "under the provision that provides for the longest potential term of imprisonment." (Former § 654, subd. (a); *Sek*, *supra*, at p. 673.) In 2021, however, the Legislature enacted Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441), which removed the requirement to impose the longest prison term. (*Ibid.*) Subdivision (a) of section 654 now states in part "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654.)

41.

"The proscription against double punishment in section 654 is applicable where there is a course of conduct which … comprises an indivisible transaction punishable under more than one statute ….   The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one."  (*People v. Bauer* (1969) 1 Cal.3d 368, 376.)

Whether section 654 applies is a question of law we review de novo.  (*People v. Corpening* (2016) 2 Cal.5th 307, 383; *People v. Harrison* (1989) 48 Cal.3d 321, 335.)

### C.     Analysis

High contends that his concurrent sentences on count 1 for corporal injury and count 2 for false imprisonment, which occurred in the bathroom, violate section 654's prohibition against multiple punishment.  High asserts that counts 1 and 2 occurred at the same time and place, and involved the same victim.  High states that his actions confining the victim in the bathroom was incidental to the domestic violence; the purpose of which was to further the domestic violence.  As such, High claims his sentence on counts 1 and 2 should be reversed and the matter remanded to the trial court in order to consider which count should be stayed under section 654.  The People concede the sentence on counts 1 and 2 violate section 654 and agree that the matter should be remanded for resentencing.

"The proscription against double punishment in section 654 is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute.…  The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one."  (*People v. Bauer*, *supra*, 1 Cal.3d at p. 376.)  In *People v. Latimer* (1993) 5 Cal.4th 1203, the defendant was convicted of both kidnapping and rape. Our High Court determined that "[a]lthough the kidnapping and the rapes were separate

acts, the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes." (*Id*. at p. 1216.) As such, it concluded the sentence violated section 654. (*Ibid*.)

Similarly, here, the record does not suggest High kept T.H. in the bathroom for any intent or objective other than to facilitate the corporal injury to her. Although High stood in front of the bathroom door to prevent T.H. from leaving, he was pushing T.H., which caused her to fall backwards and hit her head on the bathtub faucet. When K.C. opened the bathroom door, it was to intercede in the argument. Once the domestic violence was interrupted, there was no evidence High tried to prevent T.H. from leaving the bathroom. Therefore, we conclude High's course of conduct in the bathroom violated more than one statute and comprised an indivisible transaction punishable under more than one statute, in violation of section 654. Therefore, the matter shall be remanded for resentencing on counts 1 and 2 for the trial court to determine which count to stay.

## VI. Senate Bill No. 567

High claims the aggravating circumstances relied upon by the trial court in imposing concurrent upper term sentences on count 2 in case No. CRF60095, and count 3 in case No. CRF49073, do not comport with the new requirements under section 1170, subdivision (b)(2). As such, High contends that his case should be remanded for resentencing under Senate Bill No. 567. The People's position is that the matter need not be considered in light of its concession the matter should be remanded for resentencing due to a violation of section 654's prohibition against multiple punishments. We agree that since the matter will be remanded for resentencing under section 654, the trial court will have the opportunity to apply section 1170, subdivision (b) as amended by Senate Bill No. 567, and need not be decided here.

43.

## VII.    Challenge to Restitution Fine

High asserts that he is indigent and that, in light of *People v. Dueñas*, *supra*, 30 Cal.App.5th at pages 1164 and 1167, which held in part that "the execution of any restitution fine … must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine," the trial court violated his rights by imposing restitution fines without first determining whether he had the ability to pay.  Alternatively, High claims he received ineffective assistance of counsel for his trial counsel's failure to object to the restitution fines based on his inability to pay.  The People respond High forfeited this claim because he failed to object at the time of sentencing, which was long after the *Dueñas* opinion issued.  Here, because the matter is being remanded and a new sentencing will be held, High will have an opportunity to request a hearing regarding his ability to pay restitution fines then.  Accordingly, we need not decide the issue here.

## DISPOSITION

High's sentence is ordered vacated.  The true findings as to the allegations that High suffered a prior corporal injury conviction and prior strike conviction out of the 2016 Tuolumne Superior Court case No. CRF49073, are reversed and the matter is remanded for a retrial as to those allegations and for further proceedings and sentencing consistent with this opinion.  In all other respects, the judgment is affirmed.


SMITH, J.

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.

44.